**Homer J. HOLLAND, Howard R. Ross, and, First Bank, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 95–524C.

United States Court of Federal Claims.

Feb. 20, 2007.

David B. Bergman, Arnold & Porter, LLP, Washington, D.C., for plaintiffs. Melvin C. Garbow, Howard N. Cayne, Michael A. Johnson, Joshua P. Wilson, Arnold & Porter, LLP, Washington, D.C., of counsel. Donald J. Gunn, Jr., Sharon R. Wice, Gunn and Gunn, St. Louis, MO, co-counsel for plaintiff First Bank.

John H. Roberson, Trial Attorney, William F. Ryan, Assistant Director, Jeanne E. Davidson, Deputy Director, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Stuart E. Schiffer, Deputy Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant. Kenneth M. Dintzer, Richard B. Evans, Elizabeth A. Holt, William G. Kanellis, David A. Levitt, John J. Todor, James R. Whitman, United States Department of Justice, Washington, D.C., of counsel.

## *OPINION AND ORDER*

GEORGE W. MILLER, Judge.

This *Winstar*-related case is before the Court on plaintiff First Bank's motion for partial summary judgment with respect to damages and defendant's cross-motion for summary judgment with respect to damages. Plaintiff First Bank (hereinafter "plaintiff" whenever the term is used in the singular) filed its motion for summary judgment on liability and partial summary judgment on damages ("Pl.'s Mot.," docket entry 277) on September 21, 2005. Defendant filed a response to First Bank's motion and its cross-motion for summary judgment with respect to liability and damages ("Def.'s Resp.," docket entry 293) on December 7, 2005.

Plaintiff filed a reply in support of its motion and response to defendant's cross-motion ("Pl.'s Reply," docket entry 311) on February 6, 2006. Defendant filed a reply in support of its cross-motion (docket entry 314) on February 24, 2006. Following oral argument and supplemental briefing that concluded with briefs filed by plaintiffs on October 6 and by defendant on October 20, 2006, the Court on November 17, 2006, granted in part plaintiff's motion for summary judgment on liability with respect to breach of the express River Valley Savings Bank, F.S.B. ("River Valley I") and River Valley Savings Bank of Rock Falls, Illinois ("River Valley II") contracts. The Court also denied in part plaintiff's motion for summary judgment, and granted in part defendant's cross-motion for summary judgment, with respect to liability for the phase-out from regulatory capital computations of $5,000,000 of River Valley I preferred stock acquired by FSLIC in connection with the acquisition by Messrs. Holland and Ross of all the voting stock of River Valley I. Likewise, the Court denied in part plaintiff's motion for summary judgment on liability and granted in part defendant's cross-motion with respect to plaintiff's implied-in-fact contract claims, holding that defendant is entitled to summary judgment in its favor on the claims of all plaintiffs alleging breach of implied-in-fact contracts. *Holland v. United States*, 74 Fed.Cl. 225, 264 (2006). In that opinion, the Court stated that it would deal with the parties' motions insofar as they related to damages in a subsequent opinion. *Id.* This is that opinion.

For the reasons set forth below, plaintiff's motion for partial summary judgment on damages is DENIED, and defendant's cross-motion for summary judgment on damages is also DENIED.

### *FACTS* [1]

Plaintiffs Holland and Ross filed this action on August 8, 1995. Presently, plaintiffs' Third Amended Complaint seeks damages arising out of defendant's alleged breaches of contracts as a result of the enactment of the Financial Institutions Reform, Recovery and

---

1. Although plaintiff and defendant have submitted proposed findings of uncontroverted fact and responses objecting to many of their adversary's proposed findings, the facts set forth in this "Facts" section are undisputed.

Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 (1989) ("FIRREA"). An account of the factual background of this case is found in Judge Marian Blank Horn's detailed and thorough Findings of Fact in *Holland v. United States,* 57 Fed.Cl. 540, 543–49 (2003). For a more comprehensive history of the origins of the thrift industry crisis of the early 1980s, *see generally United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). The background information and facts pertinent to the Court's resolution of the parties' pending motions for summary judgment on damages are set forth herein.

In order to protect the stability of the thrift industry, the Federal Home Loan Bank Board ("FHLBB") established regulations governing the activities and financial standards of thrift institutions, including a requirement that thrifts maintain specified levels of net worth, generally expressed as a ratio of a thrift's capital to its liabilities. Joint Stipulation of Fact (docket entry 119) ("JSF") at ¶ 15. Any merger of thrifts had to be approved by the FHLBB. *Id.* ¶ 13. Sometimes, when an acquired thrift was experiencing financial difficulties, a merger could affect the ability of the resulting institution to meet the FLHBB's regulatory requirements. During the thrift crisis of the 1980s, the FHLBB would often forebear for a certain period of time from taking action against such a resulting thrift with regard to certain requirements that the thrift might not be able to meet. *Id.* ¶ 19.

## I. The River Valley I Contract[2]

On July 28, 1988, the FHLBB issued Resolution 88–638, authorizing the merger of two insolvent thrifts, Galva Federal Savings and Loan Association of Galva, Illinois ("Galva") and Mutual Savings and Loan Association of Canton, Illinois ("Mutual"), with and into Home Federal Savings and Loan Association of Peoria, Illinois ("Home"), a third insolvent thrift, the conversion of Home into River Valley I, and the acquisition of River Valley I by Messrs. Holland and Ross. *See* Joint App. to Joint Stipulations of Fact (docket

entry 119) ("JA") 4987–5004; *Holland,* 57 Fed.Cl. at 543–45. The FHLBB therein approved and authorized the execution of an Assistance Agreement on behalf of the Federal Savings and Loan Insurance Corporation ("FSLIC"). *See* JA 4995. Resolution 88–638 authorized River Valley I to issue preferred stock to FSLIC, and authorized FSLIC to purchase the preferred stock "in an amount not to exceed $5,000,000." JA 4996; *Holland,* 57 Fed.Cl. at 545. The resolution authorized River Valley I to issue a $4,600,000 subordinated debenture and further authorized "the inclusion in [River Valley I's] regulatory capital of such subordinated debenture in accordance with § 561.13 of the Insurance Regulations," subject to certain conditions. JA 4997; *Holland,* 57 Fed. Cl. at 545. The "Accounting" section of the resolution provided, in relevant part, that River Valley I was to account for the mergers and stock acquisitions, and report to the FHLBB and FSLIC, "in accordance with generally accepted accounting principles … as accepted, modified, clarified, or interpreted by applicable regulations of the Bank Board and the FSLIC," except to the extent of the following departures from generally accepted accounting principles ("GAAP"):

(a) Eight million dollars of the initial contribution by the FSLIC to River Valley, and four million six hundred thousand dollars of the principal amount of the Subordinated Debenture issued to *American National Bank and Trust Company of Chicago,* pursuant to § 6 of the Assistance Agreement, shall be credited to the regulatory capital account of River Valley in accordance with the forbearance letter authorized pursuant to this resolution; and

(b) The value of any unidentifiable intangible assets resulting from the application of push-down accounting in accounting for the Mergers and Stock Acquisition may be amortized by River Valley over a period not in excess of twenty-five (25) years by the straight line method.

JA 5000–01; *Holland,* 57 Fed.Cl. at 545–56.

Also on July 28, 1988, FHLBB sent a letter to plaintiff Holland, as President and

---

2. The statement of facts related to the River Valley I and River Valley II contracts, *infra* pages 485–88, is taken from this Court's opinion in *Holland,* 74 Fed.Cl. at 230–33.

Chief Executive Officer of River Valley I, granting certain regulatory forbearances regarding the River Valley I transaction. *See* JA 5005–07; *Holland,* 57 Fed.Cl. at 546. The forbearance letter provided that a "portion of the [FSLIC] cash contribution not to exceed $8.0 million may be credited to River Valley's regulatory capital; therefore, for regulatory accounting purposes, River Valley may book such contribution as a direct addition to its regulatory capital" subject to certain limitations. JA 5006; *Holland,* 57 Fed. Cl. at 546. The letter also stated that "[f]or purposes of reporting to the Bank Board, the value of any intangible asset resulting from the application of push-down accounting in accounting for the purchases, may be amortized by River Valley over a period not to exceed 25 years by the straight line method." JA 5006; *Holland,* 57 Fed.Cl. at 546.

On July 29, 1988, FSLIC, Holland, Ross, and River Valley I executed the Assistance Agreement for the River Valley I transaction, which was approved and authorized by FHLBB Resolution 88–638. *See* JA 4801–92; *Holland,* 57 Fed.Cl. at 546. Section 6 of the Assistance Agreement provided that FSLIC would provide to River Valley I a cash contribution of $34,215,888 plus $13,000 per diem from April 1, 1988 to and including the effective date of the agreement. JA 4835; *Holland,* 57 Fed.Cl. at 546. The Assistance Agreement further stated that "[f]or purposes of reports to the Bank Board ... and all Bank Board regulations applicable to River Valley, Eight Million Dollars ($8,000,000) of the cash contributions made under this § 6(a)(1) and (2) shall be credited to River Valley's net worth account and shall constitute regulatory capital as defined in § 561.13 of the Insurance Regulations, 12 C.F.R. § 561.13 (1988)," subject to certain restrictions. JA 4836–37; *Holland,* 57 Fed.Cl. at 546–47. The Assistance Agreement also required River Valley I to execute and deliver the $4,600,000 subordinated debenture and provided that "[t]he Subordinated Debenture shall be included in RIVER VALLEY's regulatory capital pursuant to § 561.13 of the Insurance Regulations." JA 4838; *see also Holland,* 57 Fed.Cl. at 547. Section 23 of the Assistance Agreement contained an integration clause:

This Agreement, together with any interpretation or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with it, excepting only the Subscription for Shares of River Valley Savings Bank, F.S.B., and any resolutions or letters concerning the Transaction or this Agreement issued by the Bank Board or the [FSLIC] in connection with the approval of the Transaction and this Agreement.

JA 4884. Section 25 of the Assistance Agreement provided:

All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the parties and their respective transferees, successors, and assigns, but this Agreement may not be assigned to any party nor may any rights or obligations under it be transferred or delegated to or vested in any other party, through merger, consolidation, or otherwise, without the prior written consent of the [FSLIC].

JA 4885–86.

Together, these documents constituted the express contract between the Government, Messrs. Holland and Ross, and River Valley I pertaining to the River Valley I transaction. *See generally Holland,* 57 Fed.Cl. at 562–65 (describing the "Galva, Home and Mutual Contract"). As stated in the "Procedural Background" section, *supra,* Judge Horn concluded in *Holland* that defendant breached the express contract described above by the enactment and implementation of FIRREA, and that defendant was liable to Messrs. Holland and Ross. *See id.* at 565. This Court also found that defendant was liable to First Bank for the breach of the express contract. *Holland,* 74 Fed.Cl. at 264.

## II. The River Valley II Contract

The FHLBB issued Resolution 88–612 on July 27, 1988, authorizing the supervisory conversion of Republic from mutual to stock form and the simultaneous merger of Republic with and into River Valley II. *See* JA

4373–81; *Holland,* 57 Fed.Cl. at 547. The resolution approved and authorized the execution of an Assistance Agreement on behalf of FSLIC. JA 4378. Resolution 88–612 required River Valley II to "deliver to the FSLIC documentation satisfactory to the FSLIC showing that the issuance and sale of $2,000,000 in subordinated debt to American National Bank has been successfully completed in accordance with 12 C.F.R. § 563.8–1." JA 4377, *Holland,* 57 Fed.Cl. at 547–48. The "Accounting" section of the resolution provided that River Valley II was to employ GAAP "except that $5,000,000 of the initial cash contribution by the FSLIC to River Valley, pursuant to § 6(a) of the Assistance Agreement, shall be credited to the regulatory capital account of River Valley and shall constitute regulatory capital as defined in § 561.13 of the Insurance Regulation." JA 4377; *Holland,* 57 Fed.Cl. at 547.

On July 29, 1988, the FHLBB sent a letter to plaintiff Holland, as Vice Chairman of River Valley II. *See* JA 4382–83; *Holland,* 57 Fed.Cl. at 548. The letter stated that River Valley II was "hereby granted written approval of the Federal Savings and Loan Insurance Corporation ('FSLIC') to issue and include in its regulatory capital ... a subordinated debenture in the aggregate principal amount not to exceed $2,000,000 as calculated in accordance with 12 C.F.R. § 561.13," subject to certain conditions. JA 4382; *Holland,* 57 Fed.Cl. at 548.

On July 29, 1988, FSLIC and River Valley II executed the Assistance Agreement for the River Valley II transaction, which was approved and authorized by FHLBB Resolution 88–612. *See* JA 4304–71; *Holland,* 57 Fed.Cl. at 548. Section 6 of the Assistance Agreement required FSLIC to provide to River Valley II "a cash contribution equal to $16,600,000 plus $7,500 per diem for each day after March 31, 1988 until the Effective Date [of the agreement]." JA 4327; *Holland,* 57 Fed.Cl. at 548. The Assistance Agreement also provided that:

> For purposes of reports to the Bank Board ... and all Bank Board regulations applicable to the ACQUIRING ASSOCIATION, $5,000,000 of the cash contribution made under this § 6(a)(1) shall be credited to the ACQUIRING ASSOCIATION's regulatory capital account and shall constitute regulatory capital as defined in § 561.13 of the Insurance Regulations....

JA 4327; *accord Holland,* 57 Fed.Cl. at 548. Like the River Valley I Assistance Agreement, Section 23 of the River Valley II Assistance Agreement stated:

> This Agreement, together with any interpretation or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with it, excepting only the Merger Agreement and any resolutions or letters concerning the Transaction or this Agreement issued by the Bank Board or the [FSLIC] in connection with the approval of the Transaction and this Agreement....

JA 4363–64. Section 25 provided:

> All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the parties and their respective transferees, successors, and assigns, but this Agreement may not be assigned to any party nor may any rights or obligations under it be transferred or delegated to or vested in any other party, through merger, consolidation, or otherwise, without the prior written consent of the [FSLIC].

JA 4364–65.

On May 18, 1989, the FHLBB sent a forbearance letter to plaintiff Holland, as Vice Chairman of River Valley II, to "confirm[ ] the understanding that the Bank Board and the FSLIC will waive or forbear from taking action to enforce certain requirements" against River Valley. JA 4384; *Holland,* 57 Fed.Cl. at 548. The letter provided that "[a] portion of the cash contribution not to exceed $5.0 million may be credited to River Valley's regulatory capital; therefore, for regulatory accounting purposes, River Valley may book such contribution as a direct addition to its regulatory capital," subject to certain limitations. JA 4385; *Holland,* 57 Fed.Cl. at 548. The letter also stated: "For purposes of reporting to the Bank Board, the value of any intangible asset, resulting from the application of push-down accounting in accounting

for the purchase, may be amortized by River Valley over a period not to exceed 25 years by the straight line method." JA 4385; *Holland,* 57 Fed.Cl. at 548.

These documents collectively comprised the express contract between the Government, River Valley II, and Holland and Ross with respect to the River Valley II transaction. *See Holland,* 57 Fed.Cl. at 565–66 (describing the "Republic Contract" and stating "[t]he documents noted above memorialize the contract between Holland and Ross and defendant."). As described in the "Procedural Background" section, *supra,* Judge Horn concluded that defendant breached express contract described above by the enactment and implementation of FIRREA, and that defendant was liable to Messrs. Holland and Ross. *See id.* at 566. This Court also found that defendant was liable to First Bank for the breach of the express contract. *Holland,* 74 Fed.Cl. at 264.

### III.   Defendant's Breach of the River Valley I and River Valley II Contracts

In response to the thrift crisis, Congress enacted FIRREA, which was signed into law on August 9, 1989. JSF ¶ 39. Among other things, FIRREA limited the amount of goodwill that could be used to meet the regulatory capital requirements. *Id.* ¶ 40a. The amount of "supervisory goodwill"—defined essentially as goodwill resulting from the merger, acquisition, consolidation, or other combination of a troubled thrift—that could be considered core capital was phased out over five years and eliminated as of January 1, 1995. *Id.* ¶ 42. Office of Thrift Supervision ("OTS") regulations required core capital to constitute at least three percent of the value of a thrift's adjusted total assets. *Id.*

Congress's enactment of FIRREA breached plaintiffs' contractual rights with respect to the Galva, Home, and Mutual transaction by prohibiting plaintiffs from "recording FSLIC cash contributions, preferred stock, and subordinated debt as assets for regulato-

ry capital purposes, and from amortizing the goodwill." *Holland,* 57 Fed.Cl. at 565. However, this Court found that the money damages claimed by Messrs. Holland and Ross belonged to River Valley.[3] *Holland v. United States,* 59 Fed.Cl. at 739–41. Plaintiffs determined that First Bank was the successor-in-interest to River Valley, and moved that First Bank be joined as a plaintiff. The Court granted that motion, *Holland v. United States,* No. 95–524, slip op. at 7 (Fed.Cl. May 12, 2005), and held that the Government was liable to plaintiff First Bank for the breach of the express River Valley I and River Valley II contracts. *Holland,* 74 Fed.Cl. at 264.

Plaintiff asserts that, but for the breach, River Valley III would have acquired SAFSB, a profitable, undervalued thrift that would have earned plaintiff's predecessor-in-interest "a lot of money." Pl.'s Mot. at 9–10. Furthermore, plaintiff asserts that the breach of the express River Valley I and River Valley II contracts "eliminated $25 million in contract capital—reducing River Valley's total regulatory capital by 70%." Pl.'s Mot. at 7. Plaintiff seeks summary judgment with respect to its SAFSB-related damages claims under one of three alternative theories: it claims it is entitled to either (1) $44.930 million in actual profit that SAFSB earned for Western Capital, which acquired SAFSB when River Valley III could not, *id.* at 11–20; (2) $35 million in tax-sheltered income River Valley III could have realized by 1995, *id.* at 20–22; or (3) $29.963 million, the amount by which plaintiff asserts SAFSB's "actual value" exceeded its purchase price. *Id.* at 22–24. In addition, according to plaintiff, the breach diminished River Valley III's economic value by $21.846 million, and plaintiff seeks summary judgment on its claim to recover that amount as "lost value" damages. *Id.* at 24–40.

### DISCUSSION

### I.   Standard for Decision

A court may grant summary judgment if the record shows that there is no genuine

---

**3.**  On August 14, 1991, River Valley II merged with and into River Valley I. The resulting entity is referred to as "River Valley III," a term of convenience used to describe the post-merger surviving entity, technically River Valley I, after

it had acquired River Valley II. The parties have used the term "River Valley" to refer collectively to all three River Valley entities, and the Court will do likewise. *See Holland,* 59 Fed.Cl. at 737 n. 2.

issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c) of the Rules of the United States Court of Federal Claims ("RCFC"); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it might affect the outcome of the suit. *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505.

"The moving party bears the burden of demonstrating the absence of a genuine question of material fact." *O'Connor v. United States*, 308 F.3d 1233, 1240 (Fed.Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The Court must view the evidence in the light most favorable to the nonmovant and resolve all doubts in the nonmovant's favor. *Id.* (citing *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. 2505). Once the movant has met its burden, the nonmovant must "proffer countering evidence sufficient to create a genuine factual dispute" in order to avoid summary judgment. *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir.1987). The nonmovant may not rely upon its pleadings or conclusory allegations to demonstrate a factual dispute, but rather must set forth specific facts that establish an issue for trial, by affidavit or otherwise, such that the trier of fact could reasonably find in the nonmovant's favor. *Bromley Contracting Co. v. United States*, 15 Cl.Ct. 100, 105 (1988).

When considering cross-motions for summary judgment, the Court may not grant summary judgment in favor of either party if disputes remain concerning material facts. *Mingus Constructors Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.*

## II. Plaintiff's Motion for Partial Summary Judgment on Damages

### A. SAFSB–Related Damages

"Contract remedies are designed to make the nonbreaching party whole." *Cal. Fed.*

*Bank v. United States*, 395 F.3d 1263, 1267 (Fed.Cir.2005). In *Winstar*-related cases, "[o]ne way the law makes the non-breaching party whole is to give him the benefits he expected to receive had the breach not occurred." *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed.Cir.2001) (citing RESTATEMENT (SECOND) OF CONTRACTS § 344(a) (1981)). Expectancy damages are often, though not always, lost profits. *Id.* (citing RESTATEMENT (SECOND) OF CONTRACTS § 347).

■ In order to establish expectancy damages, plaintiff must satisfy three requirements: it must demonstrate that (1) the damages it seeks were reasonably foreseeable by the breaching party at the time of contracting, *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed.Cir. 2005); (2) defendant's breach was a substantial factor in causing plaintiff's damages, *Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1317–19 (Fed.Cir.2007); and (3) "the measure of damages [is] reasonably certain," although uncertainty as to the amount of damages will not preclude recovery where plaintiff can establish "a reasonable probability of damage." *Cal. Fed. Bank*, 395 F.3d at 1267 (quoting *Glendale Fed. Bank, FSB v. United States*, 378 F.3d 1308, 1313 (Fed.Cir. 2004)).

"Both the existence of lost profits and their quantum are factual matters that should not be decided on summary judgment if material facts are in dispute." *Cal. Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1350 (Fed. Cir.2001) (citing RCFC 56(c)). "[T]his [c]ourt often has rejected the use of summary judgment in considering claims for expectancy damages." *Astoria Fed. S & L Ass'n v. United States*, 72 Fed.Cl. 712, 717 (2006). "A court never errs by declining to grant summary judgment when the better, or more prudent, course is to proceed to trial." *Fifth Third Bank of W. Ohio v. United States*, 55 Fed.Cl. 223, 236 (2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253–254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

■ Defendant argues that each of First Bank's expectancy damage claims "suffers from numerous methodological, theoretical,

and analytical errors that make it speculative and unreliable." Def.'s Resp. at 59. Defendant also argues that the claims should be dismissed because they contravene this Court's directive that the joinder of First Bank should have "no effect on the substance of the claims at issue ... and no effect on Plaintiffs' calculation of damages." *Id.* at 60. Defendant claims that the damages sought by plaintiff were not caused by the breach, nor was the manner or magnitude of harm claimed by plaintiff reasonably foreseeable. *Id.* Finally, defendant argues, any award to plaintiff First Bank based on profits actually received by Western Capital would constitute a double-recovery of profits by Messrs. Holland and Ross. *Id.* at 61.

First Bank counters by stating that its damage claims satisfy the requirements for expectancy damages: (1) but for the breach, First Bank asserts, River Valley III would have acquired SAFSB and earned the income that instead went to Western Capital; (2) the type and magnitude of River Valley III's loss was reasonably foreseeable to the government regulators, who understood River Valley III's strategy; and (3) River Valley III's losses are reasonably certain. Pl.'s Reply at 28–29. Plaintiff also asserts that defendant cannot argue, as it previously did, that the corporate form required the dismissal of the damage claims of Messrs. Holland and Ross, and now urge the Court to ignore the corporate form to deny First Bank its recovery. *Id.* at 44. Finally, plaintiff argues that its damage claims do not violate the Court's joinder order; rather, "First Bank submitted additional real-world evidence to support its SAFSB-related damages claim in part because Defendant has demanded historical data and criticized hypothetical models of damages in this and every other *Winstar* case." *Id.* at 44.

Plaintiff's expectancy damage claims raise a number of contested issues of fact which prevent the Court from granting summary judgment for either party. Among the contested issues is the question whether the breach was a substantial factor in preventing River Valley III from purchasing SAFSB. In addition, as suggested by the fact that plaintiff's expectancy damage claims are for-mulated in the alternative, it is not clear to the Court whether River Valley III's management of SAFSB would have been substantially similar to Western Capital's actual management of SAFSB, would have accelerated income in order to take advantage of expiring net operating losses, or would have immediately tried to sell SAFSB in order to take advantage of the excess of its "actual value" over its purchase price. The parties also disagree on the proper measure of SAFSB's value at the time it was purchased by Western Capital.

## B. Lost Value Damages

■ Plaintiff contends that the breach caused "River Valley as a whole to lose $21.846 million of economic value, measured as of the breach." Pl.'s Mot. at 24. Plaintiff arrives at this figure by looking at two FSLIC analyses, one pre-breach and the other post-breach, of the value of River Valley I's preferred stock. Plaintiff's expert uses the difference in FSLIC's evaluation of the value of the preferred stock to project the effect of the breach on the expected earnings and economic value of River Valley I and River Valley II.

Defendant claims that plaintiff's expert's model has a number of flaws. It "uses unreliable assumptions and methodologies, ignores the lack of a causal link between the damages he calculates and the breach, and fails to establish that any purported decline in value of the thrifts' stock was reasonably foreseeable to the Government at the time of contracting." Def.'s Resp. at 86. Defendant also asserts that the valuations relied upon by plaintiff's expert do not take into account FSLIC's incentives and responsibilities. *Id.* at 90.

There are genuine issues of material fact with regard to plaintiff's lost value claim that preclude the Court from granting summary judgment. The Court cannot say, as a matter of law, whether the FSLIC analyses presented an accurate valuation of the preferred stock before and after the breach, or whether plaintiff's expert could appropriately use the value of River Valley I preferred stock to measure the value of River Valley II. Furthermore, "[t]he Court must evaluate the

testimony, and assess the theories and assumptions of the expert witnesses before reaching a conclusion on the facts." *Astoria Fed.*, 72 Fed.Cl. at 717 (citing *Hodosh v. Block Drug Co., Inc.*, 786 F.2d 1136 (Fed.Cir. 1986)).

## III. Defendant's Cross–Motion for Summary Judgment on Damages

Defendant requests that, in addition to granting summary judgment in its favor with respect to the damages claims that are the subject of First Bank's motion for partial summary judgment, the Court also grant summary judgment in defendant's favor with respect to plaintiff's other remaining damage claims. Def.'s Resp. at 62.

Defendant argues that the lost value model presented by plaintiff's expert should be rejected because it is a hypothetical model, and hypothetical models are commonly proffered and rejected in *Winstar* cases. Def.'s Resp. at 102. According to defendant, it is inherently speculative, *id.* at 103, plaintiffs waived all damages based on the cost of replacement capital, *id.* at 106, and River Valley III could not have transferred contractual capital to First Bank. *Id.* at 107. Defendant argues that damages related to net operating losses should be dismissed because, irrespective of the passage of FIRREA and the breach, River Valley III would have been sold to First Bank, and so the breach is not the proximate cause of the loss. *Id.* at 110–11. Finally, defendant argues that plaintiff's lost leverage claim is "a thinly disguised claim for prejudgment interest." *Id.* at 111. Furthermore, defendant asserts, these claims are speculative and unreliable. *Id.* at 117.

Plaintiff argues that defendant's assertions do not rise to the level required for summary judgment; rather, they "do[ ] no more than raise issues of fact that must be resolved at trial." Pl.'s Reply at 50. As this Court has held:

> [T]he Government's burden to prevail on the issue of lost profits at summary judgment is high.... [I]n the context of *Winstar*-related litigation ... "[t]he crux of the Federal Circuit's rulings in *Cal. Fed.* and *Glendale* ... is that the plaintiffs were entitled to their day in court, regardless of their prospects for success and the difficult standard of proof, as long as they offered enough evidence to raise a genuine issue of material fact."

*Precision Pine & Timber v. United States,* 63 Fed.Cl. 122, 127 (2004) (quoting *Franklin Fed. Sav. Bank v. United States,* 55 Fed.Cl. 108, 134 (2003)). This court has held that, "[w]hile Plaintiff may have an uphill battle and is sure to face stiff opposition from Defendant," if a damages claim has a legal basis, it "may be grounds for award if properly proven." *Astoria Fed.,* 72 Fed.Cl. at 718. Even if defendant is correct that there are significant problems with plaintiff's claims, the Court is not prepared to grant judgment for defendant as a matter of law on the present record. Plaintiff will be permitted to present its case on damages at trial.

## CONCLUSION

In summary, the Court finds that genuine issues of material fact exist as to all of plaintiff's damage claims. The Court cannot say that either plaintiff or defendant is entitled to summary judgment on any of those claims given the fact-intensive nature of the parties' contentions. Accordingly, plaintiff's motion for partial summary judgment with respect to damages is DENIED, and defendant's cross-motion for summary judgment with respect to damages is also DENIED.[4] The

4. Defendant filed an earlier motion for summary judgment as to damages on March 4, 2004 (docket entry 148) and, with leave of the Court, filed a corrected version of that motion on March 9, 2004 (docket entry 153). By order filed March 5, 2004 (docket entry 149), the Court stayed plaintiffs' obligation to respond to defendant's motion for summary judgment as to damages pending resolution, *inter alia,* of issues relating to the identity of any additional parties that would be participating in the case. Those issues were not resolved until this Court's opinion and order filed May 12, 2005 (docket entry 263), which granted plaintiffs' motion to join First Bank as a plaintiff. Defendant's motion for reconsideration was denied October 24, 2005 (docket entry 284). By order filed October 28, 2005 (docket entry 289), the Court set a schedule for briefing cross-motions for summary judgment. That led to the filing on December 7, 2005, of defendant's motion for summary judgment with respect to liability and damages, which appears to the Court to supercede defendant's March 2004 motion for summary judg-

Court will schedule a status conference to consider the nature and timing of further proceedings.

IT IS SO ORDERED.

ment as to damages. Accordingly, that motion is hereby DENIED as moot.